IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

LISA ANN KABELE,

                          Plaintiff,                          OPINION AND ORDER

        v.
                                                              12-cv-776-wmc
ANDREW M. SAUL, Commissioner
of Social Security,

                          Defendant.

Pursuant to 42 U.S.C. § 405(g), *pro se* plaintiff Lisa Ann Kabele appeals the Commissioner's second denial of her application for Social Security Disability Insurance Benefits following this court's remand under sentence six of § 405(g) for evidentiary gathering. (3/27/15 Order (dkt. #17).) On remand, Administrative Law Judge Joseph D. Jacobson ("the ALJ") held additional hearings and again issued an opinion finding Kabele not disabled, which the Appeals Council opted not to review. (*See* Commissioner's January 10, 2017, Status Report (dkt. #40).) For the reasons that follow, the court will affirm the decision of the Commissioner.

BACKGROUND

A. Overview

Lisa Ann Kabele was born on August 12, 1967. She applied for SSDI due to chronic depression on November 25, 2009, approximately five years after her original claimed disability onset date of February 15, 2004, her last date of employment. Kabele later amended her onset date to March 1, 2009. Kabele was 42 years-old at the date of her amended disability onset date, and 43 years-old at the time of her first hearing and first

ALJ denial.[1]  She was 48 years-old at the time of her subsequent hearings and second denial by the ALJ.

Kabele has a two-year nursing degree, is able to communicate in English, and has past work experience as a lab technician and registered nurse. She now claims disability based on a combination of mental and physical impairments.

As referred to above, the ALJ originally determined that Kabele was not disabled in May 2011.  (AR 62-70.)[2]  On appeal, this court remanded under sentence six of § 405(g) for further evidentiary gathering.  (Dkt. #17.)  On remand, the same ALJ held a hearing on April 6, 2016, and issued a decision on May 26, 2016, again finding that Kabele was not disabled.  (AR 769-81.)  In response to a June 27, 2016, letter from Kabele to the ALJ informing him of additional medical records, ALJ Jacobson held a second hearing on September 14, 2016, and issued a third decision on November 15, 2016, finding Kabele not disabled, which is the subject of the present appeal.  (AR 1475-88.)

## B.  ALJ Decision

The ALJ found that Kabele suffered from the following severe impairments: affective disorder, anxiety disorder, personality disorder, alcohol dependence, obesity, diabetes with peripheral neuropathy, thyroid disease, migraines, sleep related breathing disorder, hypertension and peripheral arterial disease.  (AR 1478.)   The ALJ also adopted his prior opinion that plaintiff's complaints of dyslipidemia, gastroesophageal reflux

---

[1] Kabele's last-insured date was March 31, 2009, although at some point Kabele also applied for SSI, so that date is now largely immaterial.

[2] The administrative record is located at dkt. ##7, 30, 41.

2

disease, asthma, and breast cancer were non-severe impairments.   Kabele does not challenge any of these findings on appeal.  In the November 2016 decision, the ALJ further explained why he did not find her alleged, degenerative disc disease to constitute a severe impairment, explaining that "her examination and testing shows no more than mild degenerative changes as an incidental finding to other treatment."  (*Id.*)

The ALJ then considered whether any of Kabele's impairments, or combination of impairments, met or medically equaled the criteria any of the listings in 20 CFR Part 404, Subpart P, Appendix 1.  Specifically, the ALJ noted that there is no listing for diabetes, but that he is required to consider any impairments resulting from endocrine disorders and that he had taken these disorders into consideration in reaching his conclusions at steps two through four.  (AR 1479.)  The ALJ also considered whether Kabele met or medically equaled a listing due to her mental impairments.   In evaluating the four broad areas of mental functioning "criteria" in paragraph B, the ALJ found that Kabele had:  mild limitations in activities of daily living; mild limitations in social functioning; moderate limitations in concentration, persistence or pace ("CPP"); and no episodes of decompensation.  (AR 1479-80.)  In light of these findings, the ALJ concluded that neither the Paragraph B nor the Paragraph C criteria were met.

The ALJ next found that Kabele had the residual functional capacity ("RFC") to perform sedentary work, subject to the following, additional restrictions: "must avoid concentrated exposure to irritants such as fumes, odors, dusts, and gases"; "limited to simple, routine, repetitive tasks in a low stress job . . . that does not require piece work or fast moving assembly line-type work"; and "must be allowed to be off task up to 10% of

the workday, in addition to regularly scheduled breaks." (AR 1481.)  In formulating this RFC, the ALJ considered that although initially applying for disability based on depression in 2009, Kabele testified at the 2016 hearing that "her physical problems are now more limiting," pointing specifically to her diabetes, including her neuropathy, her inability to sustain a sedentary job due to anxiety and being used to lying down, as well as her more recent cardiac and sleep problems.  (AR 1481-82.)

The ALJ discounted Kabele's testimony for several reasons.  First, with respect to her mental health impairments specifically, there is no medical evidence of a worsening of her condition from 2004, when she stopped working, and her alleged onset date of 2009. Later in his opinion, the ALJ also pointed out that Kabele discontinued therapy and has not been entirely compliant with prescribed psychotropic medications.  (AR 1484-85.) Second, with respect to her claims of pain, the ALJ noted that Kabele has "pursued only infrequent, conservative treatment," noting that there was no evidence to support a limitation in standing or walking in the 2011 decision, and since then, "the record continues to document numerous occasions on which the claimant did not specify any particular complaint or made inconsistent complaints." (AR 1482.)  Specifically, the ALJ cited numerous records where Kabele reported no pain at all.  (AR 1482.)  Third, also with respect to her complaints of chronic pain, the ALJ noted the lack of objective evidence, including "no evidence of significant degenerative disc or joint disease or other physical impairment"; "no evidence of a broken toe bone"; and "[h]er musculoskeletal examinations are negative." (AR 1483.)  The ALJ also concluded that any pain, in particular, any pain in her right foot, is accommodated by his limiting Kabele to sedentary work.  Fourth, the

4

ALJ discounted her claim that her diabetes is as severe as she alleges, pointing to a record showing that her A1C had improved over the last year (despite her testimony to the contrary), and her inconsistent use of metformin. (*Id.*) Fifth, the ALJ pointed out that the more recent records do not support a finding that Kabele has made lifestyle changes, despite her hearing testimony to the contrary, pointing to recent records showing that her weight has not decreased and she continues to smoke. (AR 1483.)

The ALJ also addressed additional medical evidence received between the second and third hearing, noting "this evidence does support [a finding] that the claimant's cardiac condition is severe and that she had moderate airway obstruction." (AR 1484.) At the same time, the ALJ concluded that "this recent objective testing is consistent with the restriction regarding pulmonary irritants and time off task as stated in the [RFC]." (*Id.*) The ALJ similarly concluded that there is no suggestion that Kabele's sleep apnea would not be controlled by the CPAP machine. (*Id.*)

As for the opinions of various physicians, the ALJ discounted the opinion of Claudia M. Bavlanka, LPC, on the basis that: (1) she was not an acceptable treating source; and (2) she provided only two weeks of therapy to Kabele before rendering her opinion. (AR 1485.) Moreover, the ALJ found that Bavlanka's opinion "is not supported by the type or duration of treatment, [Kabele's] complaints . . . during treatment, nor the complaints that she has made or her ongoing daily activities," noting in particular that Kabele's treating physician stated that her depression was "well controlled." (*Id.*)

The ALJ also discounted the opinion of plaintiff's treating physician, Dr. Timothy Deering -- specifically, his opinion form dated April 11, 2016. While recognizing that Dr.

Deering had treated Kabele intermittently since 2007, the ALJ concluded that his opinion that Kabele could walk less than a block, could stand for only 15 minutes, and could not tolerate even low stress, among other restrictions, were inconsistent with his notes from annual appointments, documenting that Kabele was not compliant with prescription medication, had negative musculoskeletal, mental status and other examinations, and made infrequent and inconsistent complaints about pain.  (AR 1485-86.)

Finally, the ALJ next concluded that Kabele would not be able to perform her past relevant work, but based on the vocational expert's testimony, found that:  (1) Kabele could perform receptionist, order clerk and telephone solicitor jobs; and (2) those jobs existed in significant numbers in the national economy.  (AR 1486-87.)  Accordingly, the ALJ concluded that Kabele was not disabled.

### C.  Medical Record

#### 1.  Pre-March 2009

Because Kabele's original, alleged onset date was in 2004, a number of her medical records date back even further, covering the period of time up to her amended onset date of March 2009.  Material to her present appeal, earlier medical records establish a history of mental health issues, including a psychological consultation report and treatment notes dating from May 2001.  (AR 227.)  A May 6, 2008, echocardiography showed bicuspid aortic value with mild aortic stenosis."  (AR 328.)  Kabele also has a history of breast cancer, which explains medical records from her oncologists discussed below.

## 2.  2009 - 2013

As Kabele acknowledged in her brief, she did not experience significant, physical health issues until 2013.  From 2009 until 2013, and indeed extending into the more recent period from 2013 to 2016, Kabele saw her treating physician Timothy Deering on at least an annual basis.  In a May 19, 2009, note, Dr. Deering described Kabele as follows: "Affect brightens readily.  No tangential thoughts.  No flight of ideas.  No gross demonstration anxiety though somewhat closed posture and lack confidence and no tearfulness."  (AR 343.)  Nor were abnormalities noted with respect to a physical examination at that time, including her A1C level, which was within the normal range at 5.5.  (*Id*.)  A June 16, 2009, note from Deering described her medical problems as depression, thyroid disease, hypertension and diabetes.  (AR 335-39.)

Approximately one year later, Kabele saw Dr. Deering on June 15, 2010, for her annual appointment.  (AR 628.)  Again, Deering noted "[o]nly fair compliance [with] meds." (AR 629.)  Deering also noted that Kabele:  "Denies remarkable new concern with chronic medical concerns.  Tolerating chronic medicines without remarkable concern. Denies remarkable new psychosocial burdens."  (AR 629.)  During the physical exam, Deering further noted "diffuse discomfort with palpitation," but otherwise was normal. (AR 630.)  At an appointment on October 5, 2010, to discuss a recent endoscopy where a small hiatal hernia was noted, Deering made the same observations about Kabele as he had made in his June 2010 note, but also indicated that she "[p]erseverates about lack of consistent medical followup in past." (AR 612.)

Kabele saw Dr. Deering approximately a year later for her annual exam. A September 23, 2011, note also has Kabele denying new concerns or psychosocial burdens and tolerating medicines, though once again notes only "fair compliance." (AR 954.) Deering further noted that her "[a]ffect brightens okay," and that there was no "gross demonstration anxiety" or "deficits with recall or judgment. (AR 955.) As for her pain, Deering noted "diffuse discomfort with palpation muscle insertions." (AR 955)

Kabele's next appointment with Dr. Deering occurred a little over a year later at her 2012 annual appointment on November 5. During that appointment, Kabele complained about hot sweats, paresthesia of the tips of her toes and congestion. (AR 976.) However, a review of her systems was once again normal, and Deering specifically noted that she did not complain of swelling or painful joints. Deering also noted that her depression was "well managed" with Prozac, and that her HgbA1C had come down from 6.8 to 6.3, despite inconsistent use of metformin. (AR 976.)

During this same period of time, Kabele was attending follow-up appointments with her oncologists, Shannon E. O'Mahar, M.D., and James F. Cleary, M.D. Their medical records consistently note that there are "no concerns" with breast cancer," that she's "doing reasonably well," "no pain" and "review of systems is negative." (AR 456-58, 665, 1111, 1122, 1134, 1136, 1146.)

In 2010, Kabele underwent two mental health examinations. The first was conducted on February 2, 2010, by Gary Ludvigson, Ph.D. (AR 529-35.) Ludvigson indicated that she appears depressed, but "did not present with either psychomotor agitation or retardation," "remained cooperative at all times," "did not demonstrate any

8

irritability or belligerence," and "did not appear to be malingering nor presenting with factitious behavior." (AR 531.) Ludvigson determined her diagnoses to be anxiety disorder and personality disorder, and he set her GAF as between 50 to 55.[3] (AR 534-35.) Ludvigson further opined that her prognosis is "guarded," but "[w]ith appropriate psychotherapy if she is motivated to do so, her prognosis will improve." (AR 535.) As for her work capacity, Ludvigson found:

> At the present time, she could understand, remember, and carry out simple instructions. She likely could respond appropriately to supervisors and coworkers. She could maintain concentration, attention, and work pace at least psychologically. She may have some difficulty with routine stressors because of her anxiety level. She could adapt to changes.

(AR 535.) Second, in February 2010, Eric Edelman, Ph.D., conducted a "psychiatric review technique," in which he found that her mental health issues were "not severe impairment," although he checked affective disorders, anxiety-related disorders, personality disorders and substance addiction disorders. (AR 536.) In particular, Edelman only noted mild limitations in functioning and no episodes of decompensation. (AR 546.)

Finally, on July 12, 2011, Claudia M. Bavlanka, LPC, completed a Treatment Medical Source Statement - Mental Impairment Questionnaire, which was the basis for the court's previous remand under sentence six. As the ALJ noted, Bavlanka had four

---

[3] The Global Assessment of Functioning or GAF scale "is used to rate how serious a mental illness may be." WebMD, "What is Global Assessment of Functioning (GAF) Scale?, https://www.webmd.com/mental-health/gaf-scale-facts. A GAF score of 50-41 is defined as "serious symptoms . . . OR any serious impairment in social, occupational or school functioning," while a score of 60-51 is defined as "moderate symptoms . . . OR moderate difficulty in social occupational, or social functioning"). *Id.*

appointments with Kabele over a 2-week period of time, after which she diagnosed Kabele with dysthymic disorder early onset and problems with primary social group and assigned her a GAF of 50. (AR 670.)  She also noted "marked and frequent" functional limitations and repeated episodes of decompensation.  (AR 675.)  "Due to persistent low level depression," Bavlanka ultimately did "not foresee Lisa being able to hold down a job at this point."  (AR 672.)

### 3.  2013 - 2016

Although Kabele saw Dr. Deering on November 5, 2012, her next appointment after that was not until December 23, 2014 -- over two years later.  At that appointment, Kabele complained of pelvic pain, poor compliance with prescription medication, "mood concerns," and a chronic cough.  (AR 988.)  By the time of her April 7, 2015, follow up appointment, Kabele had begun taking medication for hypertension, but she acknowledged her compliance with taking metformin regularly for her diabetes continued to be poor.  (AR 1032.)  On February 2, 2016, Kabele had another "annual" examination with Dr. Deering, where he again noted pelvic pain, malaise and fatigue, but also noted that she denied any new concerns with chronic medical issues, and reported compliance with taking medication.  (AR 1357.)  Deering's review of Kabele's systems also noted "chronic fatigue and deconditioning," but found her otherwise normal or negative.  (AR 1360.)  On March 19, 2016, Kabele saw Dr. Deering again, in which he noted poor compliance with medication and that she suffered from "chronic pain syndrome," specifically noting pain in her left foot.  (AR 1368-70.)

On April 11, 2016, Deering completed a diabetes RFC form, in which he listed her diagnoses as: "gross and diffuse morbid concerns; morbid obesity; malaise and fatigue; anxiety and depression; affect bland." (AR 1330.) He also noted that "[e]motional factors contribute to physical symptoms." (AR 1330.) For this reason, Deering concluded that she was "incapable of even 'low stress' jobs" and that she would likely miss more than four days per month. (AR 1331, 1333.)[4]

In 2016, Kabele also underwent a number of other tests. In a June 13, 2016, appointment with cardiologist Alan Singer, M.D., Kabele complained of chest pain and lightheadedness with exertion (AR 1455-59), and a July 10, 2016, cardiac catherization revealed "moderate aortic stenosis and severe pulmonary hypertension" (AR 1572). On June 30, 2106, Kabele's pulmonary function test also showed "moderate airway obstruction." (AR 1415.) On July 21, 2016, Kabele had a CT of her abdomen / pelvis with contrast, which revealed "[n]o acute intra-abdominal abnormality," although she may have a "small adrenal adenoma." (AR 1424.) In addition, a CT of her chest with contrast conducted that same day revealed: "no significant mediastinal or hilar lymphadenopathy," her "[h]eart size is within normal limits," and "minimal thoracis scoliosis and degenerative disc disease." (AR 1426.)

In an appointment on July 12, 2016, Dr. Deering saw Kabele again, during which he discussed her recent cardiac catherization, sleep apnea diagnosis, and severe pulmonary

---

[4] On September 21, 2014, Kabele also established care with a new oncologist Alissa Weber, M.D., which she saw on a roughly six-month basis. (AR 998.) Consistent with the records above from her prior oncologist, during these appointments, the medical records note that Kabele did not complain of fatigue and "[d]enies pain anywhere." (AR 2026-27, 1036-37.)

hypertension diagnosis.  (AR 1444.)  Deering noted that Kabele suffered from continued pain, but that she was "OK with continuation of gabapentin."  (AR 1445.)

Finally, in August 2016, Kabele underwent a sleep study, where she was diagnosed with "severe obstructive sleep apnea with severe desaturations" and provided a CPAP machine.  (AR 1609.)

OPINION

The standard by which a federal court reviews a final decision by the Commissioner of Social Security is well-settled.  Findings of fact are "conclusive," so long as they are supported by "substantial evidence."  42 U.S.C. § 405(g).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).  Accordingly, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner.  *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993).  At the same time, the court must conduct a "critical review of the evidence," *id.*, and insure the ALJ has provided "a logical bridge" between findings of fact and conclusions of law, *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018).

12

Proceeding *pro se*, plaintiff submits her grounds for appeal by annotating the ALJ's decision, primarily arguing that she suffers from new physical impairments since 2013 and attaching medical records in an attempt to demonstrate these new symptoms and limitations. Following the ALJ's organizational structure, the court will, therefore, address the specific arguments Kabele raises in the annotated decision attached to her brief.

## I.   Severe Impairments

Kabele challenges the ALJ's failure to find a severe impairment with respect to her June 2016 pulmonary functioning test and "diagnosis for pulmonary emphysema." (Pl.'s Br. (dkt. #44-1) 7.) From the court's review of the relevant medical record, there is no diagnosis for emphysema; instead, plaintiff was diagnosed with moderate airway obstruction. Not to minimize the significance of this diagnosis, Kabele fails to explain how this impairment is not accommodated by limiting her to sedentary work and restricting her to avoid concentrated exposure to pulmonary irritants, as the ALJ reasoned. (AR 1484.) Moreover, the record also reflects that this is not a new diagnosis, having previously been diagnosed with borderline obstructive disease, something that her treating physicians consistently noted was caused by her smoking and admonished her to quit. (Def.'s Opp'n (dkt. #45) 7 (citing AR 956, 958-59, 976, 1007, 1481, 1483, 1484).)

Kabele also challenges the ALJ's failure to find her degenerative disc disease as a severe impairment. Rather than ignore Kabele's degenerative disc disease, the ALJ correctly noted that the testing showed only mild changes. (AR 1478.) Indeed, from her own annotations, Kabele appears to be arguing that an abdominal scan and prescription of Tylenol #3 supports a finding of a severe impairment. Assuming Kabele is referring to the

July 21, 2016, CT of her abdomen/pelvis with contrast, that scan revealed "[n]o acute intra-abdominal abnormality" and a "small adrenal adenoma," without any mention of disc impairments. (AR 1424.) At minimum, plaintiff has failed to explain why the RFC limiting her to sedentary work does not accommodate these early signs of a degenerative disc disease condition. *See Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010) (noting that where ALJ found some impairments severe and others not, "this particular determination is of no consequence . . . [b]ecause the ALJ recognized numerous other severe impairments, he was obligated to proceed with the evaluation process.").

## II. Listing Analysis

Next, Kabele challenges the ALJ's determination that she did not meet or medically equal any listing. Specifically, with respect to her diabetes diagnosis, Kabele takes issue with the ALJ's mention that there is no listing specific to diabetes, but this is an accurate statement of the social security regulations, not a basis for remand. (AR 1469 (citing 76 FR 19792, effective 6/07/11).) Moreover, the ALJ considered her diabetes at steps two through four, as required by the regulations. While Kabele also points to Dr. Deering's April 2016 diabetic RFC questionnaire to further challenge the ALJ's consideration of her diabetes, as set forth above, the ALJ offered a reasonable explanation for discounting Deering's opinions. (AR 1485-86.) Indeed, Kabele's description of the process by which Deering completed this form reinforces the ALJ's finding that it was largely based on Kabele's self-reports about her limitations: "Dr. Deering performed with me via interview style. He incorporated what I testified as to what I can or cannot do on a day to day basis

14

-- along with his own knowledge and assessment of my conditions." (Pl.'s Br. (dkt. #44-1) 8.)

Kabele would further fault the ALJ for finding that she did not meet or medically equal one of the mental health listings on the basis that she "left [her] job in 2000 and took a 3 month medical leave for depression-exhaustion-anxiety." (Pl.'s Br. (dkt. #44-1) 8.) As the Commissioner pointed out in response, however, Kabele's mental health status in 2000 has little to no bearing on her claim for disability based on an alleged onset date of 2009. Regardless, there is no dispute that she continued working until 2004. As set forth above, the ALJ also described various reasons for discounting Kabele's reporting of mental health limitations, including that she discontinued therapy and has not been entirely compliant with prescribed psychotropic medications. (AR 1484-85.) Similarly, Kabele challenges the ALJ's finding that she suffers from moderate, as opposed to "severe," difficulties with CPP, but offers no evidentiary support. And even if the court were to credit her challenge, Kabele would need to have either two, marked impairments *or* a marked impairment with repeated episodes of decompensation.[5]

## III.  RFC Formulation

Finally, Kabele offers several challenge to the ALJ's determination of her RFC, including his discounting of her credibility. As an initial matter, Kabele takes issue

---

[5] To be fair, plaintiff also appears to challenge the ALJ's finding that there were no episodes of decompensation, directing the court to the opinion of Claudia M. Bavlanka, LPC, but, as discussed in detail above, the ALJ offered a reasonable explanation for discounting her opinion, including that she was not an acceptable treatment sources, had only treated Kabele for approximately two weeks before rendering this opinion, and the opinion was contrary to other record evidence, including her own note that her depression was well controlled. (AR 1485.)

generally with the ALJ placing little or no weight on her subjective testimony. As the Seventh Circuit has explained, "[a]lthough a claimant can establish the severity of his symptoms by his own testimony, his subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007); *see also* 20 C.F.R. § 416.908. As set forth above, the ALJ engaged in that very analysis, detailing the medical evidence undermining many of Kabele's subjective complaints.

While Kabele also claims that "many test results and lab reports included [allude] to the facts that they are abnormal and indicate a disease process going on" (Pl.'s Br. (dkt. #44-1) 10), it is not at all clear to which results and reports she refers. Again, assuming she is referring to the 2016 results and tests showing cardiac issues and moderate airway obstruction, the ALJ not only acknowledged these results, but included hypertension as a severe impairment and changed her exertional limitation from light to sedentary. Kabele also asserts that her heart condition will continue to deteriorate. (*Id.* at 13.) However, this appeal already concerns a lengthy period of time -- from the alleged disability onset date of March 1, 2009, through her third hearing date in September 2016. Kabele may be able to apply again for supplemental income if her medical conditions deteriorate, but the court sees no error in the ALJ's treatment of the evidence available during the relevant period.

This leaves Kabele's challenge to the ALJ's discussion of her inconsistent statements about pain, arguing that she experiences "back and neck pain, my feet hurt, my ankles hurt," and that she cannot stand for very long. (Pl.'s Br. (dkt. #44-1) 11.) Consistent

16

with the court's description above, the ALJ pointed out several notations in the medical record where Kabele reported *no* pain to her treating physicians.  Moreover, the ALJ properly considered Kabele's lack of compliance with her diabetes medication in discounting her reports of diabetic neuropathy.  *See Dixon v. Massanari*, 270 F.3d 1171, 1179 (7th Cir. 2001) (considering claimant's lack of compliance with diabetes treatment in discounting claimed limitations).  Moreover, the ALJ appropriately accounted for her diabetic neuropathy by limiting her to sedentary work.

In summary, having reviewed Kabele's various objections, the court sees no remaining grounds on which to remand this case again for further proceedings.  As such, the court will affirm the denial of benefits.

ORDER

IT IS ORDERED that:

1)  The decision of defendant Andrew M. Saul, Commissioner of Social Security, denying plaintiff Lisa Kabele's application for disability benefits is AFFIRMED.

2)  The clerk of court is directed to enter judgment for defendant.

Entered this 15th day of May, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

17